**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT WEAVER,** | : | |
| | : | |
| **Plaintiff** | : | **Civil No. 1:09-CV-2357** |
| | : | |
| **v.** | : | **(Judge Stengel)** |
| | : | |
| **LAURA BEVERIDGE,** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **Defendant** | : | |

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

Now pending before the Court is Defendant Detective Laura Beveridge's motion for summary judgment on Plaintiff Robert Weaver's lone remaining claim against her for malicious prosecution in violation of the Fourth Amendment to the United States Constitution. The motion is fully briefed and has been referred to the undersigned for purposes of preparing a report and recommended disposition. For the reasons that follow, it is recommended that the motion be granted, and the case closed.

## II.   **FACTUAL BACKGROUND**[1]

On June 25, 2002, a woman with diminished mental capacity named Loretta Nispel reported to the York City Police Department that she had been sexually assaulted by her father, Robert Weaver, Sr., and her stepbrother, Robert Weaver, Jr., the Plaintiff in this case.  (Doc. 70, Defendant's Statement of Material Facts, ¶¶ 4-5.) According to Ms. Nispel, and the police report that was prepared after Ms. Nispel notified the York City Police Department, the sexual assault allegedly took place in December 2001.[2]  (Id. ¶ 6.)  Ms. Nispel informed police about the alleged assault

---

[1] The background set forth in this report and recommendation is taken chiefly from the parties' competing statements of material fact, taken in the light most favorable to Plaintiff as the non-moving party.  However, where Defendant has asserted a material fact and supported that assertion with citation to record evidence, and where Plaintiff has failed to dispute that assertion through citation to other record evidence, we have accepted the fact stated by Defendant as true. We also observe that in his counterstatement of material facts, Plaintiff often purports to rely on evidence in the record to dispute Defendant's assertions, but in many instances is really relying upon his own argument rather than evidence.  In other instances, Plaintiff either exaggerates the evidence in the record, or misstates it, in an effort to create the appearance of a disputed issue of fact.

[2] Plaintiff insists that the assault is alleged to have occurred in October 2001, whereas Defendants aver that it was reported to have taken place in December 2001.  Plaintiff seems to be basing this assertion on his own testimony and the testimony of Defendant's daughter, Lakeisha Weaver, who testified during her deposition about events in October 2001.  (Doc. 76, Ex. 4.)  Notably, however, Defendant denies that the incident ever took place, and instead claims that the only time Loretta Nispel was at his apartment was in October 2001.  This testimony is thus not probative of when the alleged assault was claimed to have occurred. Detective Beveridge testified that the alleged sexual assault occurred in December

more than six months later, in or around June 2002, apparently at the urging of her

then-boyfriend, Steve Cochran.  Defendant Laura Beveridge, at that time a detective

with the York City Police Department assigned to the sex crimes unit, was tasked

with investigating Ms. Nispel's allegations.

Detective Beveridge initially interviewed Ms. Nispel on July 16, 2002.  (Doc.

65, Ex. A, Beveridge Dep. at 23:2-3; Doc. 66, Ex. B, at p.00007.)  During that

interview, Ms. Nispel told Detective Beveridge that on the day she was assaulted she

was visiting with her father, Robert Weaver, Sr., and with his wife, Betty Weaver at

their home before going to Plaintiff's home in York.  (Doc. 65, Ex. A, Beveridge Dep.

---

2001, and that the incident was reported in June 2002.  (Doc. 65, Ex. A,
Deposition of Laura Beveridge, at 25.)  We find no apparent basis for Plaintiff's
insistence that Ms. Nispel was alleged to have been assaulted in October 2001.
Indeed, Ms. Weaver testified that the date she was discussing during her
deposition was before her grandfather, Robert Weaver, Sr., married Betty Weaver.
(Doc. 76, Ex. 4, Lakeisha Weaver Dep. at 6.)  In marked contrast, during her
deposition, Detective Beveridge testified that the assault was alleged to have
occurred after the Weavers' marriage.  (Id. at 36.)  Additionally, Ms. Weaver
testified about events that occurred at Robert Weaver, Sr.'s home, (Doc. 76, Ex. 4,
Lakeisha Weaver Dep. at 6-8), whereas the alleged assault is said to have taken
place at Robert Weaver, Jr.'s home.  (Doc. 65, Ex. A, Beveridge Dep. at 41, 56.)
Although Plaintiff criticizes Detective Beveridge's failure to interview Lakeisha,
the record provided to the Court supports her testimony that she had no reason to
interview Ms. Weaver, since she had reason to believe that Lakeisha was
supposedly present on the date of the alleged incident.  Lastly, we observe that
other evidence in the record provides additional substantiation for Defendant's
claim that the assault was alleged to have occurred at Robert Weaver, Jr's home in
December 2001.  (Doc. 66, City of York Police Report, Dated July 16, 2002.)

at 23:16-22.)  Ms. Nispel said that Betty Weaver later left Plaintiff's residence, and was absent for several hours.  (Id. at 23:23-24.)  According to Ms. Nispel, Plaintiff and his father had been drinking that day.  (Id. at 23:24-24:3.)

During her interview with Detective Beveridge, and as reflected in the detective's investigative notes drawn up during the interview, Ms. Nispel told her that Plaintiff and his father raped and sodomized her at the same time; forced her to perform oral sex on them; and inserted their fingers and a screw driver into her vagina.  (Id. at 24 - 35.)  During this time, Ms. Nispel claims she was confined in a bedroom, slapped by her father, and told her not to tell anyone about the incident. (Id. at 24.)

Because Ms. Nispel is mentally challenged, and has some difficulty communicating verbally, Detective Beveridge drew several drawings that were intended to help Ms. Nispel to clarify her allegations as to where and how her father and Plaintiff touched and assaulted her.  (Doc. 66, Ex. B, at pp. 00010 and 00020-00028.)  These drawings reflect that Ms. Nispel made notations to indicate how she claimed to have been touched.  (Id.)  After this stage of the initial interview, Ms. Nispel became distraught and the interview was ended.  (Id. at p. 00009.)

Detective Beveridge next interviewed Steve Cochran, who at that time was a boyfriend or close companion of Ms. Nispel.  (Id. at p. 00008.)  According to

4

Detective Beveridge's notes and testimony, Mr. Cochran told her that he had observed bruising on Ms. Nispel's arms on the day of the alleged rape, and that he remembered Ms. Nispel as being very upset.  (Id.)  Mr. Cochran also told Detective Beveridge that Ms. Nispel told him what happened to her.  (Id.)  According to Detective Beveridge, the information provided by Ms. Nispel and Mr. Cochran was substantially the same.  (Id.)  Following these initial interviews, Detective Beveridge received supplemental information from Ms. Nispel on July 30, 2002, and July 31, 2002, and rendered additional drawings to reflect information that Ms. Nispel had added to her claims, including that her father and Plaintiff had anally raped her.  (Id. at p. 00010.)

In addition to these interviews, Ms. Nispel was also subjected to a medical exam, but this examination, which occurred months after the alleged incident was inconclusive, and neither supported nor refuted her allegations.  (Doc. D, Deposition of James Reeder, at 34:7-14; Doc. 65, Ex. A, Beveridge Dep. at 33-37.)

Detective Beveridge also interviewed Robert Weaver, Sr.'s wife, Betty Weaver, and confirmed that on the date of the alleged assault Ms. Weaver left Plaintiff's home for approximately three hours before returning later that day.  (Doc. 65, Ex. A, Beveridge Dep. at 41:2-11.)  During her interview, Ms. Weaver told Ms. Beveridge

that when she left only Plaintiff, his father, and Ms. Nispel were present at the home. (Id. at 50:23-51:8.)

In addition to Detective Beveridge, James Reeder, at that time an Assistant District Attorney for York County, was assigned to the case. (Doc. 68, Ex. D, Reeder Dep. at 7:6-14.) Mr. Reeder helped to direct the investigation, assisted in determining the charges to be filed, and ultimately approved the final charges brought against Plaintiff. (Id. at 9:20-10:23.) As part of this process, on August 22, 2002, Mr. Reeder, Detective Beveridge, a disability advocate named Dana Spangler, and other representatives interviewed Ms. Nispel about the alleged assault. (Doc. 66, Ex. B, at p. 00010; Doc. 65, Ex. A, Beveridge Dep. at 74:9-75:4.)

Also as part of the investigation, the District Attorney's office arranged for a telephone intercept to record a phone call between Plaintiff and Ms. Nispel on October 9, 2002. (Doc. 66, Ex. B at p. 00012.) During this call, Ms. Nispel attempted to discuss the alleged assault, and to get Plaintiff to apologize for what she claimed he did to her. (Doc. 67, Ex. C, Deposition of Robert Weaver, Jr., at 38:3-18; Ex. B, at pp. 00031-00035.) During the call, Plaintiff denied the allegations and indicated that he had no idea what Ms. Nispel was talking about. (Doc. 67, Ex. C, Weaver Dep. at 38:3-18.)

6

Approximately one week later, on October 10, 2002, Ms. Nispel's mother, Eleanor Coxen, called Detective Beveridge and told her that Ms. Nispel's story was false, and that Steve Cochran had put her up to it. (Doc. 66, Ex. B, at p. 00010.) In the background of the phone call, Detective Beveridge heard Ms. Nispel crying, but Ms. Coxen refused to put her on the phone. (Id.) In response, Detective Beveridge went to Ms. Coxen's home, where she found Ms. Coxen and Ms. Nispel visibly frightened and upset. (Id. at p. 00012.) Upon questioning, Ms. Coxen told the detective that Robert Weaver, Sr. had come to the house, yelled at her, and ordered her to have Ms. Nispel drop the charges. (Id. at p. 00013.) In addition, Robert Weaver, Sr. told Ms. Coxen to call Plaintiff to tell him that the charges would be dropped. (Id.) According to Ms. Coxen, Mr. Weaver threatened to have Ms. Nispel taken away unless Ms. Coxen had her drop the charges. (Id.) After discussing this incident with Detective Beveridge, Ms. Coxen retracted her earlier statement, telling the detective that she did believe her daughter's allegations, and that she believed that the Weavers had raped Ms. Nispel. (Id.) For her part, Detective Beveridge testified that she also believed Ms. Nispel's claims to be true. (Doc. 65, Ex. A, Beveridge Dep. at 91:5-12.)

Ms. Nispel also provided information to Detective Beveridge that substantiated Ms. Coxen's allegations that Robert Weaver, Sr. had come to the house. In this

regard, Ms. Nispel told Detective Beveridge that on the date the elder Weaver came to Ms. Coxen's house, Ms. Nispel had seen a white car pull up behind the home. (Doc. 66, Ex. B, at p. 00012.)  Detective Beveridge then drove past Robert Weaver, Sr.'s home and saw a white Ford Taurus station wagon parked in front.  (Id. at p. 00014.)  Detective Beveridge next obtained motor vehicle records and learned that the car was registered to Betty Emig and Robert Weaver, Sr.  (Id.)

Following her meeting with Ms. Coxen and Ms. Nispel, Detective Beveridge went to Plaintiff's home with another detective, arrested Plaintiff, and transported him to the police station.  (Doc. 65, Ex. A, Beveridge Dep. at 66:2-4, 66:16-17; Doc. 66, Ex. B, at p. 00013.)  At the station, Plaintiff waived his Miranda rights and was interviewed.  (Doc. 66, Ex. B, at pp. 00003 and 00013.)  Plaintiff consented to allow Detective Beveridge to search his home, but the home was never searched.[3]

---

[3]  It appears that officers declined to search the house given how much time had elapsed between the alleged assault and Weaver's arrest.  Plaintiff makes much of this failure, and does so in part because Ms. Nispel had alleged that after being forced to perform oral sex she had spit Robert Weaver, Jr.'s ejaculate onto a rug in the bedroom where she claims she was assaulted.  (Compl. ¶¶ 23, 25; Doc. 67, Ex. C, Weaver Dep. at 54:2-15; Doc. 65, Ex. A, Beveridge Dep. at 68:15-69:1-2.)  Although Plaintiff believes Detective Beveridge's failure to search the home for this evidence provides support for his claims of malicious prosecution, we disagree.  The unchecked evidence from Detective Beveridge and ADA Reeder indicates that the decision not to search Plaintiff's home was based on the amount of time that had passed between the alleged incident and Plaintiff's arrest, which was nearly a year after the assault was claimed to have occurred.  (Doc. 65, Ex. A, Beveridge Dep., at 69:3-9; Ex. D, Reeder Dep., at 12:11-13:8.)

For his part, ADA Reeder testified that he advised the police regarding the charges to be filed against Plaintiff, was responsible for directing the investigation, and recommended that charges be filed against Plaintiff. (Doc. 68, Ex. D, Reeder Dep. at 18:13-20.) According to ADA Reeder, his decision to prosecute Plaintiff was based upon his independent judgment of the evidence that had been developed during the investigation. ADA Reeder also testified that Detective Beveridge did not withhold information from him during the investigation, and that his independent judgment was not interfered with by other officers or detectives. (Id. at 13:15-20.) ADA Reeder also met with Ms. Nispel in August 2002, prior to filing charges, and testified during his deposition that Ms. Nispel was "one of the most compelling witnesses that [he had] ever seen." (Doc. 68, Ex. D, Reeder Dep. at 19.)

Following the investigation, Plaintiff was charged with Rape, Involuntary Deviate Sexual Intercourse, Sexual Assault, Aggravated Indecent Assault, Indecent Assault and Incest. (Doc. 67, Weaver Dep. at 55:5-6; Doc. 66, Ex. B at p. 00014.) Plaintiff posted bail and was released pending trial. (Doc. 67, Ex. C, Weaver Dep. at 55:5-7.)

Plaintiff proceeded to trial in July 2003, and was convicted by a jury of multiple charges against him and sentenced to prison. Thereafter, Plaintiff attempted to have his conviction and sentence set aside by filing petitions pursuant to

Pennsylvania's Post-Conviction Relief Act, 42 Pa. Cons. Stat. Ann §§ 9541 et seq. On his third effort, which was denied by the trial court, Plaintiff prevailed on appeal to the Pennsylvania Superior Court on claims that his counsel was ineffective for failing to call Betty Weaver and Lakeisha Weaver as witnesses on his behalf. (Compl. ¶¶ 30, 41.)  The Pennsylvania Supreme Court rejected the Commonwealth's appeal, and Plaintiff's case was thereafter remanded for a new trial in February 2009. (Id. ¶¶ 31-32.)  At this time, Plaintiff had spent nearly six years in prison.

On remand, the case was assigned to Christopher Moore, an Assistant District Attorney with the York County District Attorney's Office.  (Doc. 69, Ex. E, Deposition of Christopher Moore, at 6:19-7:19.)  Following this assignment, ADA Moore spoke with Ms. Nispel and her mental health case worker, and was informed that Ms. Nispel's life was improving.  (Id. at 7:7-17.)  In light of this information, and in consideration of the amount of time Plaintiff had already spent in custody, ADA Moore decided to file a *nolle prosequi* of the criminal charges, as he thought it would be pointless to put Ms. Nispel through another trial, since Plaintiff was likely to receive no additional jail time even if convicted.  (Id. at 7 - 18.)  Following the entry

of a *nolle prosequi*, Plaintiff was released from York County Prison in February 2009. (Doc. 67, Ex. C, Weaver Dep. at 12:23-13:5.)[4]

## III.   PROCEDURAL HISTORY

Plaintiff commenced this lawsuit on December 1, 2009.  (Doc. 1, Compl.)  In the complaint, Plaintiff sued Detective Beveridge for unlawful seizure and malicious prosecution, in violation of the Fourth Amendment.  (Doc. 1, Compl,, Count I.)  In addition, Plaintiff sued ADA James Reeder for abusing his prosecutorial authority in maliciously prosecuting Plaintiff for the alleged sexual assault, and for allegedly conspiring with Betty Weaver and Robert Weaver, Sr.'s attorney.  Plaintiff framed these claims as violations of his Fourth and Fourteenth Amendment rights.  (Id., Count II.)  Plaintiff also included claims against Robert Weaver, Sr.'s wife, Betty Weaver, alleging that she conspired with ADA Reeder to maliciously prosecute Plaintiff, and for conversion of Plaintiff's property.  (Id., Count III.)

On Christmas Eve, 2009, Detective Beveridge and ADA Reeder moved to dismiss the claims against them.  (Doc. 5.)  The District Court granted this motion as to Plaintiff's claims against ADA Reeder, and granted the motion in part with respect to Detective Beveridge, dismissing Plaintiff's claims for unlawful arrest on the

---

[4]The plaintiff's father and co-defendant, Robert Weaver, Sr., was also convicted of this sexual assault and remains incarcerated for his role in this crime.

grounds that this claim was time-barred by the applicable statute of limitations. (Doc. 15, at 5.)   However, the District Court found that Plaintiff's claims for malicious prosecution were timely filed, and adequately pled, and the Court, therefore, permitted these claims to proceed. (Id.)  With respect to Plaintiff's claims against Betty Weaver, the District Court found that she died in February 2010, and the Court provided Plaintiff with leave to substitute a proper party pursuant to Rule 25 of the Federal Rules of Civil Procedure.  (Id. at 8.)

On October 1, 2010, Plaintiff voluntarily withdrew his claims against Betty Weaver, leaving as the sole remaining claim Plaintiff's claim of malicious prosecution in violation of the Fourth Amendment against Detective Beveridge.

Detective Beveridge moved for summary judgment on this remaining claim on February 5, 2012.  (Doc. 63.)  The motion is fully briefed (Docs. 64-71, 75-77, 80-81.)  The motion is ripe for disposition and has been referred to the undersigned as part of our pretrial management, and for purposes of preparing a report and recommended disposition.  For the reasons that follow, find that there is insufficient evidence to support Plaintiff's lone remaining claim for malicious prosecution against the detective who investigated the sexual abuse claims against him, and we, therefore, must recommend that the motion be granted, and the case closed.

## IV.   **STANDARD OF REVIEW**

Rule 56(a) of the Federal Rules of Civil Procedure provides as follows:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  For purposes of Rule 56, a fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.  Haybarger v. Laurence Cnty. Adult Prob. & Parole, 667 F.3d 408, 412 (3d Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  For an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Id. (quoting Anderson, 477 U.S. at 248-49).

Accordingly, in support of a motion for summary judgment, the moving party must show that if the evidence of record were reduced to admissible evidence in court, it would be insufficient to allow the non-moving party to carry its burden of proof.  See Celotex v. Catrett, 477 U.S. 317, 323 (1986).  Provided the moving party

has satisfied this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007). Instead, if the moving party has carried its burden, the non-moving party must then respond by identifying specific facts, supported by evidence, which show a genuine issue for trial, and may not rely upon the allegations or denials of its pleadings. See Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007); see also Fed. R. Civ. P. 56(c).

In adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, Anderson, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party, Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. Id. Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Anderson, 477 U.S. at 252; see also Big Apple BMW, 974 F.2d at 1363. In reaching this determination, the Third Circuit has instructed that:

14

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the factfinder to ascertain the believability and weight of the evidence.

Id. In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted); NAACP v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 476 (3d Cir. 2011).

## IV.   **DISCUSSION**

### A.   **Malicious Prosecution**

Plaintiff's sole remaining claim in this lawsuit alleges that Detective Beveridge violated his rights under the Fourth Amendment to the United States Constitution by maliciously prosecuting him for sexual assault.[5] This malicious prosecution claim is brought against Detective Beveridge in an undisputed factual setting which reveals that a prosecutor, and not the detective, made the decision to initiate these charges;

---

[5] In his opposition brief, Plaintiff seems to suggest that has brought claims for malicious prosecution under both state and federal law. (Doc. 75, at 12.) Review of the complaint in this case, however, reveals that Plaintiff has only brought suit for alleged violations of the Fourth Amendment. (Doc. 1.)

that the charges were tried to a jury which found Weaver guilty beyond a reasonable

doubt; and that the ultimate dismissal of these charges after six years of post-

conviction litigation did not entail any finding of factual innocence.

The United States Court of Appeals for the Third Circuit has explained the

elements of this claim as follows:

> To prove malicious prosecution under section 1983 for alleged violations of the Fourth Amendment, a plaintiff must show that (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the criminal proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

Johnson v. Knorr, 477 F.3d 75, 81-82 (3d Cir. 2007) (citing Estate of Smith v.

Marasco, 318 F.3d 497, 521 (3d Cir. 2003)); see also Kossler v. Crisanti, 564 F.3d

181, 186 (3d Cir. 2009).   In this case, Plaintiff has failed to develop evidence

sufficient to support these elements, in particular that Defendant Beveridge initiated

the prosecution, that there was a lack of probable cause for the charges, and that THE

criminal proceedings were terminated in his favor.

16

### 1.     Initiation of Criminal Proceedings

Notably, in an action against a police officer for malicious prosecution in violation of the Fourth Amendment, a plaintiff's claim for injury is limited to the harm resulting from any seizure occurring prior to conviction, because the Third Circuit has held that post-conviction incarceration does not constitute a seizure for Fourth Amendment purposes.  See Donahue v. Gavin, 280 F.3d 371, 381 (3d Cir. 2002).  In this case, however, the District Court has dismissed Plaintiff's claim alleging that his initial seizure in 2002 was unlawful, and entered an order finding that Plaintiff's only remaining claim was one for malicious prosecution.  Under Donahue, even if Plaintiff were able to prevail on his remaining claim, Plaintiff would appear to be foreclosed from recovering damages from Defendant Beveridge for the time he spent in custody following his conviction.  Id.  But aside from this apparent total limitation on potentially recoverable damages against this particular defendant, Plaintiff's claim against Detective Beveridge for malicious prosecution is fundamentally flawed for other reasons, and ultimately fails for lack of evidence.

In addition to those elements that a plaintiff must prove in order to prevail on a malicious prosecution claim generally, in cases where a plaintiff has sued a police officer for malicious prosecution, he bears a particular burden of showing that the police officer "initiated" the criminal proceedings being challenged.  See Stango v.

Rodden, No. Civ. A. 00-CV-5709, 2001 WL 1175131, at *4 (E.D. Pa. Aug. 21, 2001) (quoting Harris v. City of Philadelphia, No. Civ. A. 97-3666, 1998 WL 481061 (E.D. Pa. Aug. 14, 1998) (citing Albright v. Oliver, 510 U.S. 266, 279 n.7 (1994) (Ginsburg, J., concurring)).  This is because, in the typical case, "a prosecutor, not a police officer, 'initiates' criminal proceedings against an individual." Id.

It appears that the Third Circuit has not squarely addressed whether an investigating police officer can be liable under the Fourth Amendment for initiating a malicious prosecution.  However, district courts within the Third Circuit have considered this issue, and have consistently held that "a plaintiff can only proceed against a police officer under a malicious prosecution theory if the officer 'knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion.'" Domenech v. City of Philadelphia, No. 06-1325, 2009 WL 1109316, *8 (E.D. Pa. April 23, 2009); see also O'Connor v. City of Philadelphia, No. 05-2879, 2006 WL 1490134, at *7 (E.D. Pa. May 26, 2006), aff'd, 233 F. App'x 161 (3d Cir. 2007); Stango v. Rodden, No. 00-5709, 2001 WL 1175131, at *4 (E.D. Pa. Aug. 21, 2001); Garcia v. Micewski, No. 97-5379, 1998 WL 547246, at *9 (E.D. Pa. Aug. 24, 1998); Merrero v. Micewski, No. 96-8534, 1998 WL 414724, at *6-7 (E.D. Pa. July 22, 1998) ("A police officer may only be held to have

'initiated' a criminal proceeding if he knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion.").

These decisions are in line with those reached by other circuit courts of appeal that have been faced with this issue.  See, e.g., Reed v. City of Chicago, 77 F.3d 1049, 1053 (7th Cir. 1996) ("It is conceivable that a wrongful arrest could be the first step towards a malicious prosecution" even though "the State's attorney, not the police, prosecutes a criminal action"); Senra v. Cunningham, 9 F.3d 168, 173 (1st Cir. 1993) ("If the evidence upon which the prosecutors based the filing of the information was false, the state prosecutors could not have exercised their discretion. As a result, the actions of the prosecutors would not have insulated the police officers from suit for malicious prosecution."); Sellums v. Powell, 566 F.2d 167, 192-93 (D.C. Cit. 1977) (remanding malicious prosecution claim to trial court to consider police officer's role in the prosecution alleged to have been malicious).

Applying these legal guidelines to the undisputed facts developed in this case, however, reveals that Plaintiff's claim falls short.  Plaintiff has pointed to no evidence that Detective Beveridge provided false information to ADA Reeder, or that she otherwise interfered with the District Attorney's Office's investigation, or ADA Reeder's independent decision to bring criminal charges against Plaintiff.  Instead of providing evidence of falsehoods or interference, Plaintiff relies on his own steadfast

assertions that Ms. Nispel's story was inherently unbelievable, and that Detective Beveridge should not have believed her claims, apparently because Ms. Nispel had made other allegations of sexual assault in the past.   Plaintiff also argues that Detective Beveridge should have conducted additional investigation, such as by searching Plaintiff's home, or by interviewing Plaintiff's daughter, and that her failure to do these things is tantamount to interfering with the investigation.   We disagree.

First, Detective Beveridge testified during her deposition that she believed Ms. Nispel's claims that she was sexually assaulted by her father and step brother, and this belief was formed after several interviews with the alleged victim, and following her investigation of the claims generally.   Plaintiff's repeated assertions that Ms. Nispel was clearly unbelievable, and should have been discredited, are further undermined by the fact that a jury listened to Ms. Nispel testify during the criminal trial, and evidently believed her testimony given that they convicted Plaintiff of the charged offenses.   For his part, ADA Reeder testified that Ms. Nispel was "on of the most compelling witnesses [he had] ever seen."  (Doc. 68, Ex. D, Reeder Dep. at 19.)

What Plaintiff argues most strenuously is that Detective Beveridge should have discounted Plaintiff's claims because she learned that Plaintiff had, in the past, made other allegations of sexual assault against other men.   But the record shows that Detective Beveridge and the prosecution looked into these prior allegations, and

brought them to the attention of the court and the defense prior to trial.  Nothing in the record even remotely suggests that Detective Beveridge withheld this information from ADA Reeder, or the Court, or even Plaintiff.  To the contrary, ADA Reeder testified that he was made aware of the past allegations, and that he directed Detective Beveridge to look into them as part of this investigation.  (Doc. 68, Ex. D, Reeder Dep. at 20-21.)

Plaintiff tacitly suggests that because Ms. Nispel, a developmentally challenged individual, had made prior allegations of rape or assault, she should not have been believed.  Plaintiff provides no law to support this suggestion, and the evidence of record in this case indicates only that Detective Beveridge looked into prior allegations that Ms. Nispel may have reported to two different police departments prior to her allegations against the Weavers.  The record actually indicates that with respect to at least one of these reported sexual assaults, prosecutors may have brought charges, and convicted the alleged perpetrator.  (Id. at 22.)  With respect to the other reported assaults, nothing in the record indicates that they were fabricated, and ADA Reeder specifically testified that he found nothing unbelievable about Ms. Nispel's past allegations of assault.  (Id. at 20) ("At no time did I get the feeling or come to a conclusion that any past accusation by Ms. Nispel was a false accusation, a false story.  And when we finally litigated the matter before Judge Brillhart, the Court

came to the same conclusion, that there were no false accusations within the accusations that Miss Nispel had previously made.").

Second, to the extent Plaintiff is claiming that Detective Beveridge somehow misled prosecutors by failing to disclose the identify of Lakeisha Weaver, or by failing to interview her, there is no merit to this argument.  Nothing in the record supports Plaintiff's apparent contention that Detective Beveridge should have interviewed Lakeisha Weaver, or that she had any reason to believe that she was present at Plaintiff's home on the day of the alleged rape.  Indeed, if Plaintiff believed that Lakeisha Weaver could have provided helpful testimony or otherwise serve as an alibi on his behalf, Plaintiff would have been the party with the greatest incentive to make this information available to the police.  But it appears he never did, and Ms. Weaver was apparently not interviewed or even called as a witness at Plaintiff's trial.[6]

Instead, Detective Beveridge testified that she first became aware that Plaintiff had a daughter only after she interviewed the Plaintiff following his arrest, in response to general questions about Plaintiff's family.  Furthermore, as we observed above, Lakeisha Harris testified during a deposition that she was present at her father's house sometime in October 2001.  Ms. Nispel informed Detective Beveridge

---

[6] Ms. Weaver testified during her deposition that she was called as a witness by her grandfather, but not by her own father, during his criminal trial.  (Doc. 76, Ex. 4.)

that she was assaulted in December 2001, and thus even if Detective Beveridge had been aware that Ms. Weaver was at Plaintiff's home sometime in October 2001, this would have provided no reason to have placed her on notice that Lakeisha Weaver might be a potential witness to be interviewed in connection with the investigation.

In sum, we find there is no evidence that could support a finding that Detective Beveridge "initiated" Plaintiff's prosecution, or that she withheld information from the prosecutor who ultimately made the decision to bring charges against Plaintiff. To the contrary, the evidence is unequivocal that ADA Reeder was responsible for leading the investigation, and that he made the decision to bring charges against Plaintiff in the exercise of his informed discretion, and that his discretion was informed by Detective Beveridge's investigation and his own interview of Ms. Nispel. Thus, Plaintiff's claim fails on this ground alone.

### 2.    Probable Cause

Many of these same factors are equally fatal to Plaintiff's contention that Detective Beveridge lacked probable cause to believe he had committed the alleged sexual assault. To prevail on a claim for malicious prosecution, the Plaintiff bears the burden of proving that the Defendant lacked probable cause when she initiated charges against him. See Camiolo v. State Farm, 334 F.3d 345, 363 (3d Cir. 2003). Stated differently, where a criminal prosecution is found to have been based on

probable cause, a civil rights plaintiff cannot maintain a claim for malicious prosecution.  Montgomery v. De Simone, 159 F.3d 120, 124 (3d Cir. 1998).  Plaintiff has not come forward with evidence to show an absence of probable cause, and thus has failed to support this essential element of a malicious prosecution claim.

Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.  Orsatti v. N.J. State Police, 71 F.3d 480, 482 (3d Cir. 1995).  Probable cause is "defined in terms and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing a crime."  Merkle v. Upper Dublin School Dist., 211 F.3d 782, 789 (3d Cir. 2000) (citing Sharar v. Felsing, 128 F.3d 810, 817-18 (3d Cir. 1997)).  The evidentiary standard for probable cause is "significantly lower than the standard which is required for conviction." Wright v. City of Philadelphia, 409 F.3d 595, 601 (3d Cir. 2005); see also Orsatti v. N.J. State Police, 71 F.3d 480, 482-83 (3d Cir. 1995) ("Probable cause to arrest requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt.").

In general, questions about whether probable cause existed are properly reserved for the jury, Montgomery v. De Simone, 159 F.3d 120, 124 (3d Cir. 1998),

but a district court "may conclude 'that probable cause exist[ed] as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding,' and may enter summary judgment accordingly." Merkle, 211 F.3d at 789 (quoting Serwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997)). In undertaking this evaluation, a court "must look at 'the totality of the circumstances' and use a 'common sense' approach to the issue of probable cause." Sharar, 128 F.3d at 818 (citations omitted).

Applying these considerations to the case before the Court, we find that the record is clear, and effectively undisputed, that at the time of Plaintiff's arrest, Detective Beveridge had probable cause to believe Plaintiff had committed the sexual assaults alleged by Ms. Nispel.  As noted above, Ms. Nispel provided detailed allegations regarding the details of the assault, and Detective Beveridge found Ms. Nispel to be credible.  As a result, Detective Beveridge proceeded to investigate the allegations further, including interviewing Ms. Nispel's then-boyfriend, Steve Cochran, and by speaking with Ms. Nispel's mother, Eleanor Coxen, and learning that Robert Weaver, Sr. had threatened Ms. Coxen unless she persuaded Ms. Nispel to drop the charges against him and Robert Weaver, Jr.

Notwithstanding these facts, Plaintiff argues that whether probable cause existed is a disputed issue that should be reserved for a jury.  In support of his

argument, Plaintiff relies upon many of the same assertions that he made regarding the quality of Detective Beveridge's investigation that were discussed above. Thus, Plaintiff faults Detective Beveridge for failing to interview Plaintiff's daughter, Lakeisha Weaver, and for failing to discredit Ms. Nispel as a witness because she had made allegations of being the victim of sexual assault in the past.

But we have already found that there is no evidence to suggest that Detective Beveridge should have interviewed Ms. Weaver, or that Detective Beveridge had any reason to believe that Ms. Weaver could provide relevant information. Thus, we cannot perceive how this alleged failure has bearing on our probable cause assessment. We also cannot agree with Plaintiff's assessment of Ms. Nispel's veracity with respect to these past allegations. Plaintiff asserts that Detective Beveridge was aware that Ms. Nispel had a history of *falsely* accusing men of rape, but the record does not support this contention. Detective Beveridge testified that she looked into Plaintiff's prior allegations and discovered one case where the charges were cleared by exception, but she did not recall discovering that any of the allegations were unfounded. (Doc. 65, Ex. A, Beveridge Dep. at 14:19-21.) Other evidence developed in this case indicates that the prosecution looked into these past instances where Ms. Nispel had made allegations of sexual assault, and found no basis to disbelieve them. ADA Reeder testified unequivocally that nothing in the past

allegations suggested that they were fabricated, and that the state trial court also reached the same conclusion.

Finally, Plaintiff makes a curious argument about Ms. Nispel's competency. This argument seems to be based on the fact that Ms. Nispel was permitted to testify during Plaintiff's criminal proceedings, but was not permitted to be deposed in this case, as the Court entered a protective order after finding that a deposition would be detrimental for Ms. Nispel's mental health. (Doc. 58.) We do not fully understand the nature of Plaintiff's argument regarding Ms. Nispel's competency, nor do we appreciate how it has conceivable bearing on whether probable cause existed in 2002 to believe that Plaintiff had raped Ms. Nispel. The record is unchallenged that Detective Beveridge interviewed Ms. Nispel on multiple occasions and found her to be a credible witness. Detective Beveridge also undertook additional investigative steps that she found lent further support for Ms. Nispel's allegations, and Detective Beveridge's investigative efforts were in addition to those also undertaken by ADA Reeder, who ultimately determined to bring criminal charges. We conclude that the evidence is clear that probable cause existed in this case, and disagree that Plaintiff has created a dispute of fact on this point.

### 3.      Favorable Termination

Finally, Plaintiff's malicious prosecution claim against Detective Beveridge also fails for another fundamental reason:  he has not demonstrated that the charges were resolved in his favor.  Although ADA Moore ultimately moved to *nol pros* the charges against Plaintiff in 2009, Plaintiff has not identified evidence to show that the decision to *nol pros* the charges was tantamount to a finding that Plaintiff was innocent of the charges.

"[W]hile 'a grant of nolle prosequi can be sufficient to satisfy the favorable termination requirement for malicious prosecution, not all cases where the prosecutor abandons criminal charges are considered to have terminated favorably.'" <u>Donahue v. Gavin</u>, 280 F.3d 371, 383 (3d Cir. 2002) (quoting <u>Hilfirty v. Shipman</u>, 91 F.3d 573, 579-80 (3d Cir. 1996)).  To the contrary, "[a] *nol pros* signifies termination of charges in favor of the accused '*only when their final disposition is such as to indicate the innocence of the accused*.'" <u>Donahue</u>, 280 F.3d at 383 (quoting §660 cmt. a Restatement (Second) of Torts (1976) (emphasis in original).  Therefore, in order to prevail on a claim for malicious prosecution, a plaintiff "must be innocent of the crime charged in the underlying prosecution." <u>Id.</u> (quoting <u>Hector v. Watt</u>, 235 F.3d 154, 156 (3d Cir. 2000)).

In this case, despite Plaintiff's insinuations to the contrary, the only evidence of record indicates that ADA Moore elected to *nol pros* the charges in 2009 because he concluded that Plaintiff was unlikely to receive anything other than a sentence for time already served, and because he believed it was unnecessary to put Ms. Nispel through the burden of testifying against Plaintiff in a new criminal proceeding. Plaintiff has pointed to no evidence to show that ADA Moore sought the *nol pros* because prosecutors had concluded that Plaintiff was actually innocent of the charges.

In explaining the favorable termination requirement in <u>Donahue</u>, the Third Circuit Court of Appeals used language that is equally applicable to this case, and which ultimately forecloses Plaintiff's claim against Detective Beveridge:

> It is clear from even a cursory reading of the request for a *nol pros* that the resulting dismissal can hardly be described as "indicat[ing] the innocence of the accused." The prosecutor simply reasoned that Donahue was not likely to receive any additional jail time if convicted in a retrial, and concluded that further prosecution was therefore not an appropriate use of limited resources. Far from indicating Donahue's innocence, the nol pros merely reflected an informed and reasoned exercise of prosecutorial discretion as to how best to use those limited resources. It ides not suggest that Donahue was innocent of the remaining criminal charges. Accordingly, there is no way that Donahue can establish the malicious prosecution that is necessary to establishing the constitutional violation he has alleged as the basis for his § 1983 civil rights claim, and the defendants are entitled to judgment for that reason.

Donahue, 280 F.3d at 384.

The same result applies in this case, where Plaintiff has been unable to adduce sufficient evidence to show that he was actually innocent of the charges, or that prosecutors abandoned the charges because they had determined he was innocent, which Donahue holds is required.  The evidence we have been provided, and which is effectively unchallenged by Plaintiff, shows only that prosecutors made the decision to *nol pros* the charges following a careful assessment regarding the propriety of a new trial, where it was determined that Ms. Nispel was making improvements in her life that might be upset by a new trial, and where the ultimate result of a conviction would likely have been no more than a time-served prison sentence.  Because Plaintiff has not developed evidence that reasonably demonstrates a dispute of fact on this point, we must recommend that the District Court grant summary judgment on this claim for this reason as well.

## B.  Qualified Immunity

But even if Weaver could survive summary judgment on his lone remaining claim for malicious prosecution in violation of the Fourth Amendment, we would be constrained to recommend that the District Court find that Detective Beveridge has qualified immunity from this claim.

In order to establish a civil rights claim Plaintiff must show the deprivation of a right secured by the United States Constitution or the laws of the United States. Satisfying these elements alone, however, would not guarantee that Weaver is entitled to recover damages from Detective Beveridge.  Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, 555 U.S. 223 (2009).  This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit." Crouse v. S. Lebanon Twp., 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted).  Qualified immunity:

> balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

Pearson, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries.  First, the court must evaluate

whether the defendant violated a constitutional right.  <u>Saucier v. Katz</u>, 533 U.S. 194, 201-02 (2001), abrogated in part by <u>Pearson</u>, 555 U.S. 223; <u>Curley v. Klem</u>, 499 F.3d 199, 206 (3d Cir. 2007); <u>Williams v. Bitner</u>, 455 F.3d 186, 190 (3d Cir. 2006).  If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor.  <u>Saucier</u>, 533 U.S. at 201.  If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted.  <u>Pearson</u>, 555 U.S. at 232; <u>Saucier</u>, 533 U.S. at 201-02.  The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right.  <u>Williams</u>, 455 F.3d at 191 (citing <u>Saucier</u>, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity."  <u>Wilson</u>, 526 U.S. at 615.  The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful."  <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002) (quoting <u>United States v. Lanier</u>, 520 U.S. 259, 271 (1997) (internal quotation marks and

citation omitted)).  In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." <u>Wilson</u>, 455 F.3d at 191 (quoting <u>Hope</u>, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, <u>Pearson</u>, 555 U.S. at 239-40, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted.  <u>Id.</u>  Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity.  <u>Gruenke v. Seip</u>, 225 F.3d 290, 299-300 (3d Cir. 2000); <u>Crouse</u>, 668 F. Supp. 2d at 671; <u>see also</u> <u>Grant v. City of Pittsburgh</u>, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).") Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment. <u>See</u> <u>Montanez v. Thompson</u>, 603 F.3d 243 (3d Cir. 2010).

Applying these guidelines to the case before the Court, we conclude that Detective Beveridge would be entitled to qualified immunity. As we observed above, we find that Plaintiff's arrest and prosecution was supported by probable cause, and that Plaintiff has otherwise failed to come forward with evidence sufficient to support his claim for malicious prosecution in violation of the Fourth Amendment. Thus, at the outset we find that Plaintiff has not adequately supported his claim for a constitutional violation in the first instance. "Where a defendant asserts a qualified immunity defense in a motion for summary judgment, the plaintiff bears the initial burden of showing that the defendant's conduct violated some clearly established statutory or constitutional right." Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997). Plaintiff has not met that burden in this case, and we, therefore, find that Detective Beveridge has qualified immunity from Plaintiff's remaining claim.

Moreover, even if Plaintiff had come forward with some evidence to create a triable issue of fact with respect to the alleged constitutional violation, we would still be constrained to recommend that the Court grant summary judgment because the undisputed facts of this case do not suggest that Detective Beveridge, as the investigating officer, could have reasonably been expected to know that her conduct during the investigation violated a clearly established constitutional right. To the contrary, the evidence shows that Detective Beveridge shared with the prosecuting

34

attorney the information developed as part of her investigation into Ms. Nispel's allegations; ADA Reeder himself met with Ms. Nispel prior to bringing criminal charges against Plaintiff, found her to be a credible witness, and authorized this prosecution; and where the prosecution presented evidence to state courts, and those courts found that probable cause existed to pursue the charges.

The United States Court of Appeals for the Third Circuit has recently had occasion to address the question of whether a police officer's reliance upon the legal advice of a district attorney prior to making an arrest cloaks the officer with qualified immunity. Kelly v. Borough of Carlisle, 622 F.3d 248 (3d Cir. 2010). In Kelly, the Third Circuit "reject[ed] the notion that a police officer's decision to contact a prosecutor for legal advice [prior to making an arrest] is per se objectively reasonable." 622 F.3d at 255. At the same time, the appeals court acknowledged "the virtue in encouraging police, when in doubt, to seek the advice of counsel." Id. After surveying other courts' treatment of this question, the Third Circuit held that "encouraging police to seek legal advice serves such a salutary purpose" that it constitutes a "'thumb on the scale'" in favor of qualified immunity. Id. Therefore, the court held that "a police officer who relies in good faith on a prosecutor's legal opinion that the arrest is warranted under the law is presumptively entitled to qualified immunity from Fourth Amendment claims premised on a lack of probable

cause." Id. at 255-56.  At the same time, however, the Court instructed that an officer's reliance on such legal advice "must itself be objectively reasonable . . . because 'a wave of the prosecutor's wand cannot magically transform an unreasonable probable cause determination into a reasonable one.'"  Id. at 256 (quoting Cox v.Hainey, 391 F.3d 25, 34 (1st Cir. 2004)).  Therefore, a plaintiff may rebut the presumption that an arrest was based upon probable cause "by showing that, under all the factual and legal circumstances surrounding the arrest, a reasonable officer would not have relied on the prosecutor's advice."  Id.

Here, the undisputed evidence shows that Detective Beveridge relied in good faith upon the judgment of the prosecutor assigned to this case, ADA Reeder, who found the victim compelling as witness and ultimately obtained a conviction based upon that victim's testimony and other corroborating evidence.  Therefore, Beveridge is entitled to this presumption in favor of qualified immunity.  For his part, Weaver has not presented evidence which would overcome this presumption in favor of qualified immunity by showing that the officer's decision to follow the prosecutor's instruction was objectively unreasonable.  In the face of these unchallenged facts, and a lack of evidence to demonstrate any wrongdoing on the part of Detective Beveridge during the course of the investigation, Plaintiff cannot at this stage rely on mere argument, cursory factual denials, or conclusory claims of constitutional violations

to defeat Defendant's claim for qualified immunity, and the pending motion for summary judgment.

## V.    __RECOMMENDATION__

For the foregoing reasons, IT IS RECOMMENDED THAT Defendant's motion for summary judgment (Doc. 63.) be granted, and the case closed.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 12th day of September 2012.

**<u>S/Martin C. Carlson</u>**
Martin C. Carlson
United States Magistrate Judge